UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EVELYN KAYODE )<br>520 Mellon Street, SE )<br>Washington, DC 20032 )<br>       )<br>       Plaintiff, )<br>   v. )<br>       )<br>MERRICK GARLAND )<br>United States Attorney General )<br>U.S. Department of Justice )<br>950 Pennsylvania Avenue, NW )<br>Washington, DC 20530-0001 )<br>       )<br>       Defendant. ) | Civil Action No. _____ |

**COMPLAINT**
(Employment Discrimination based on Age, Race, Disability, Sex and
Retaliation for Prior EEO Activity)

**INTRODUCTION**

1. Plaintiff, Evelyn Kayode, brings this action against her former employer, the Department of Justice (DOJ) pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (Title VII), Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 (Rehabilitation Act), and 29 C.F.R. § 1614.101. Plaintiff contends that while she worked as a GS-13 Criminal Investigator with the DOJ Office of the Inspector General (OIG), she was subjected to discrimination on the basis of her race (black), sex (female), national origin (Nigerian), disability (anxiety, IBS, hypertension), and protected EEO activity and denial of reasonable accommodations for her known disabilities. Plaintiff avers: (1) her managers in the DOJ OIG refused to take effective action when a white coworker singled her out for abuse; and then (2) retaliated against her for complaining of discrimination and retaliation by launching a course of action against her designed to both demoralize her and set her up for failure and the

termination of her employment, and that as a result of these actions her health began to decline. Plaintiff further contends that when and she sought accommodations and applied for positions in other DOJ OIG for which she was well qualified to extricate her from the toxic environment her efforts were rebuffed and her managers escalated the abuse to force her out of her position with the DOJ OIG.

## JURISDICTION

2. This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-16(c), and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, thereby presenting a federal question.

## VENUE

3. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § e-5(f)(3) because Plaintiff worked in this District, Defendant refused to select her for positions located in this District, decisions about her requests for accommodation and forced psychiatric evaluation were made in the District, Defendant is located, and has offices in this District and maintains records and conducts business in this District.

## PARTIES

4. Plaintiff, Evelyn Kayode, has for 15 years served as a Criminal Investigator with the Federal government. She was employed with DOJ OIG from August 2014 she departed the OIG and transferred into a lateral Grade 13, Step 6 position as a Postal Inspector at the U.S. Postal Inspection Service effective November 9, 2019. As such, during all times relevant to this

complaint she was employed by the DOJ Office of the Inspector General (OIG), as a GS-13 Criminal Investigator.

5. Defendant is Merrick Garland is the Attorney General of the United States, and as such is the head of the U.S. Department of Justice, a department within the Executive Branch of the government of the United States that has employed more than 500 persons in each of the last 20 weeks. He is here sued in his official capacity only.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. On March 1, 2019, Plaintiff filed an EEO complaint pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 (Title VII), Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 (Rehabilitation Act), and 29 C.F.R. § 1614.101(a) & (b), contending that she was subjected to discrimination on the basis of her race (black), sex (female), national origin (Nigerian), disability (anxiety, IBS, hypertension), and protected EEO activity. In May 2019, July 2019, October 2019, and December 2019, Plaintiff raised several other issues through amendment requests. In her EEO Complaint as amended Plaintiff alleged, among other things, that between February 2017 and December 2019:

(A) Managers in the DOJ OIG discriminated against her by allowing a coworker to abuse and harass her;

(B) Based on Plaintiff's demonstrated performance, as documented in available official statistic data, her manager(s) had no basis for giving her the lowest passing performance ratings;

(C) Defendant delayed and failed to act on Complainant's accommodation requests and then singled her out for increased scrutiny after her requests to telework were approved;

(D)  Defendant changed the terms and conditions of Complainant's employment by a series of vexatious actions making it impossible for her to continue in her position in the Fraud Detection Office;

(E)  There is no basis for the assertions by Plaintiff's managers about deficiencies in her work record, written applications, and responses during the interviews and Defendant's claims the selectees were better qualified than Complainant;

(F)  When she tried to extricate herself from what had become for her a toxic work environment by applying for positions in a different office with different supervisors, on multiple occasions, she was denied selection for other positions in DOJ OIG for which she was well qualified, and other less qualified employees were selected instead.

On September 28, 2022, the Defendant issued a final agency decision regarding Plaintiff's administrative EEO complaint, which advised Plaintiff of her right to file a civil action regarding the matters raised in his complaint within 90 days of that decision. Plaintiff thus has exhausted her administrative remedies as required by Title VII, 42 U.S.C. § 2000e-16(c), and 29 U.S.C.S. § 794a and has timely filed this complaint within the time (90 days) provided in the final agency decision.

## STATEMENT OF FACTS

7.  Plaintiff Evelyn Kayode is a black female. Her national origin is Nigerian. By training and experience, Plaintiff is a career criminal investigator. She graduated with a Bachelor of Science Degree in Accounting from the Chicago State University in 2007. In 2013, she was awarded a master of Science Degree in Business Information Technology from Depaul University. She began her employment with the United States Department of the Treasury, Internal Revenue Service - Criminal Investigation, as a Special Agent Student Trainee (GS-1899-05) in April 2007.

She served as a Criminal Investigator with Internal Revenue Service until August 2014 and was promoted in turn to Criminal Investigator/Special Agent (GS-1811-13). She has been a Certified Fraud Investigator since 2010.

8. In August 2014, Plaintiff began employment at the DOJ OIG as a Special Agent in the Investigation Division. In December 2015, she began working in OIG's Fraud Detection Office (FDO) where she was assigned to investigate contract, healthcare and grant fraud, with an investigative emphasis on data analytics. There were approximately twenty-five people on staff at FDO, to include Special Agents (Investigators), Auditors, Analysts, and Data Scientists. Her supervisor was GS-15 Special Agent in Charge (SAC) Lewe Sessions.

9. According to OIG's Performance Work Plan (PWP) for a GS-12/13 Criminal Investigator, there were three critical job elements for that position, and to receive an overall rating of "successful" for the weighted (60%) rating element of Accountability for Organizational Results in the PWP, the investigator must plan, organize, and conduct assigned investigations, routinely complete all administrative tasks, and prepare concise and logical written summaries of investigation activities and recommended actions. The PWP indicates that a successful rating also requires the Investigator to exhibit time and workload management skills, successfully complete assigned tasks, and maintain working knowledge of pertinent laws.   Plaintiff's responsibility as an FDO investigator was to conduct administrative, civil, and criminal investigations, which extends to interviewing witnesses, writing reports, and basically carrying out anything that would need to be done in the course of an investigation.

10. Beginning in July 2018, Plaintiff's first-line supervisor was Assistant Special Agent in Charge (ASAC) Amber Howell her second-line supervisor was SAC Lewe Sessions, a white male, non-Nigerian, male, and d her third-line supervisor was Deputy Assistant Inspector

General (Deputy AIG) Elise Chawaga. ASAC Howell and SAC Sessions remained Plaintiff's supervisors until she left DOJ in November 2019, Deputy AIG Chawaga left the Department of Justice in July 2019. As of May 2019, Plaintiff's third-line supervisor was Assistant Inspector General (AIG) Sarah Lake. To perform her duties, Plaintiff had to work with Investigative Specialist (IS) Denise Korpinen, a white female, non-Nigerian female who also was assigned to the FDO.

11. Between late 2016 and June 2018, IS Korpinen, whose main responsibility was to provide administrative support to OIG members, sent Plaintiff offensive emails and refused to provide her with administrative support. For example, Plaintiff asked Korpinen to make arrangements to obtain a transcript within ten days, but Korpinen notified the transcriber's office that the deadline for transcript receipt had been changed to twenty days, without consulting Plaintiff. Korpinen did not have the authority to change that deadline. On another occasion when the FDO was in the midst of moving to another office location, Plaintiff had left her personal property at the old site, intending to pick it up later. Korpinen emailed a question to Plaintiff about her personal property and then, without giving her a chance to respond, arranged for her personal items to be moved the next day. Korpinen exceeded her authority by acting arbitrarily in that manner. On other occasions, IS Korpinen would not respond to Plaintiff's statements and work requests in an appropriate way. For example, in May 2018, when Plaintiff was talking with ASAC Drew Hartwell about a Crime Victims Fund matter, with the door closed, Korpinen barged into the office and began arguing with Plaintiff in a belligerent, unprofessional manner. Korpinen yelled at her, got in her "physical space and face," and berated her about many things, without any intervention or remonstrance by ASAC Hartwell. Plaintiff told Korpinen to "get out of my face," after which Hartwell interceded and escorted Korpinen out of the office. IS Korpinen did not

respond to Caucasian or non-Nigerian people in a hostile manner, therefore Plaintiff contends that Korpinen's targeted hostility was based on Plaintiff's race and national origin. Although Plaintiff asked ASAC Hartwell and SAC Sessions to intervene, Korpinen's offensive emails and tense personal interactions continued during this period.

12. In June 2018, ASAC Hartwell left the office and ASAC Howell became Plaintiff's immediate supervisor. Almost immediately, Howell began to accuse Plaintiff of not doing her work, not working her scheduled hours, and not making progress on her investigations despite the fact that FDO's statistical records reflected that Plaintiff's productivity was similar to or better than other FDO agents. In addition, Howell's interactions with Plaintiff during the months following June 2018 continued to be unprofessional and offensive. For example, when office employees were asked to provide fingerprints, aware that Plaintiff and others had already provided fingerprints when they "onboarded," When Plaintiff asked Howell whether she would have to be fingerprinted again, rather than answering Plaintiff's question, Howell said she did not know why fingerprints were needed, and then rolled her eyes and walked away. On another occasion, after Plaintiff had taken sick leave, Howell, who did not make similar requests of other subordinates, required Plaintiff to provide a copy of the email notifying Howell that she had to take sick leave. Although Howell was the only other black female assigned to FDO, she is not from Nigeria and she singled Plaintiff out from other employees in the office and there were no other black female line agents in the office.

13. In addition, SAC Sessions, often in tandem with actions taken by Howell, participated in the harassing and discriminatory treatment of Plaintiff. For example, Sessions would request access logs from the OIG's Crystal City, Virginia, office where the FDO was

housed, to determine if Plaintiff was in the building as she claimed. When Plaintiff went to Sessions to address her frustrations with Howell, Sessions often ended conversation saying, "It is what it is," which signaled his unwillingness to address the harassing nature of Howell's actions.

14. In October 2018, Plaintiff received her performance rating for the October 2017-September 2018 that was prepared by ASAC Howell, who had become her supervisor only in June 2018. Plaintiff's 2017-2018 Performance Appraisal Record (PAR) contained ratings on three elements: 1) Accountability for Organizational Results (60% weighting) – Successful, 2) Accountability for Diversity/People/Workforce (20% weighting) – Excellent, and 3) Accountability for Taxpayer Value and Customer Service (20% weighting) – Successful. In this way, Howell downgraded the rating given Plaintiff from the prior year by lowering the rating for Element 3 "excellent" to "successful." Plaintiff was blindsided by the rating, because although the performance goals and objectives had changed from the previous year, she had done more work during the 2017-2018 rating period and, despite the heavier work load, her statistical accomplishments had improved and compared favorably with other agents in FDO. Moreover, Plaintiff had met with ASAC Hartwell who had been her supervisor until June 2018, for some input about her performance during the period October 2017 until June 2018 when he had been her supervisor, and he provided his feedback, which confirmed her "accomplishments throughout the rating period."

15. On November 14, 2018, because of her deteriorating medical condition, Plaintiff submitted an accommodation request to ASAC Howell asking to be allowed to telework for a six-week period starting December 3, 2018. Plaintiff explained that she needed to work from home for a while because of the hostile environment at work, which Plaintiff described as very stressful, resulting in increased anxiety, decreased sleep, higher blood pressure, and an aggravation of her

IBS. After some time had passed, she frequently asked Howell and the Human Resources Office (HR) about the status of her request, until it was eventually granted on November 30, 2018. Since others who requested telework were routinely provided immediate accommodation, Howell could have granted the accommodation immediately instead of claiming that she did not have the authority. In this way OIG management prolonged the time Plaintiff was forced to work a hostile environment. Moreover, the accommodation she received was both demeaning and restrictive as SAC Sessions and ASAC Howell imposed requirements that Plaintiff work on specific matters, for her work to be completed within specific time-frames, and that she send daily emails to them at the start and stop of her workday. No such requirements were imposed on employees who had not requested accommodation of their disability.

16. On November 20, 2018, ASAC Howell directed Plaintiff to start sending her written work to Senior Special Agent Grover Davis for review. Howell presented this arrangement as a standard procedure that was followed by other groups within the FDO. However, Plaintiff later learned that Davis had been designated as her "writing coach" because Howell claimed that Plaintiff's writing was deficient, which was inexplicable because Plaintiff had been writing reports as an agent for thirteen years and had always been told that she was a "strong writer." Nonetheless, Plaintiff submitted her work to Davis who consistently found no problems with her writing, although Howell injected herself into the situation, by reviewing Plaintiff's draft while Davis was still reviewing them. Plaintiff sought to address the situation on November 28, 2018, by meeting with Howell. However, Howell became abusive toward her in the meeting when Plaintiff suggested that she and ASAC Howell share notes of what had been discussed and Howell began

screaming at Plaintiff that she was not going to put things in writing. Howell had not raised her voice or belittled any other subordinate.

17. On December 7, 2018, SAC Sessions and ASAC Howell issued Plaintiff a Memorandum of Caution regarding the November 28, 2018, meeting, portraying Plaintiff as the aggressor, stating that she had been combative and disruptive during the meeting and threatening her with disciplinary action.

18. On December 31, 2018, ASAC Howell sent Plaintiff an email accusing her of not having made progress on her work assignments. Howell noted that progressing on work assignments was one of the conditions that SAC Sessions had detailed when he agreed to her reasonable accommodation request to work from home. Plaintiff explained that while teleworking she had worked overtime, including at night and on the weekends, to be sure that she did not fall behind on her work. Plaintiff responded in detail to every single allegation by Howell, thereby demonstrating that Howell's claim that she was falling behind on her work was untrue.

19. On January 9, 2019, Plaintiff submitted a request to HR, SAC Sessions, and ASAC Howell, requesting an eight-week extension of her prior accommodation and provided additional medical documentation in support of her request. HR responded with an email granting her two additional weeks of telework, and indicating that a decision on the remaining six weeks would be made on or before January 25, 2019. Then, on January 14, 2019, because Howell continued her unprofessional and rude interactions with her, Plaintiff became ill and took sick leave for the next day. On January 15, while she was on leave, Howell and Sessions sent her multiple emails to the point that she could no longer tolerate the situation. Plaintiff therefore was forced to request that she be placed on sick leave/furlough status for the remainder of the week.

20. In January 2019, while she was on leave from the FDO, SAC Sessions and FDO SharePoint Administrator Kenneth Dieffenbach removed Plaintiff's ability to access the FDO SharePoint site (an intranet site for FDO personnel) and also removed her from the FDO's email list. As a result, Plaintiff was excluded from all FDO communications between FDO management and FDO personnel, and her name was also removed from the FDO organizational chart. While Sessions claimed that these actions were taken because she had gone TDY to OIG's Investigative Support Branch (ISB), other FDO employees who went on detail were not similarly removed.

21. On or about January 23, 2019, despite the fact that Fitness for Duty examinations for Criminal Investigators was not a standard practice, Plaintiff was singled out by Deputy Assistant Inspector General (DAIG) Elise Chawaga, a white, non-Nigerian, female, and ordered to submit to a psychiatric evaluation, by DAIG. OIG officials then designated the psychiatrist made an appointment for April 2019. Plaintiff was the only agent in her work unit who was forced to submit to a psychiatric examination.

22. On January 28, 2019, just days before Plaintiff started her detail with the ISB, SAC Sessions and ASAC Howell told FDO Special Agents to stop communicating with Plaintiff. Although the usual practice was for FDO agents who received a case previously assigned to another FDO agent was to maintain contact with the original agent, as result of this instruction, with a few exceptions, agents that were assigned Plaintiff's cases did not contact her.

23. On January 30, 2019, DAIG Chawaga, SAC Sessions, and others reassigned Plaintiff from the FDO to the Investigative Division's Investigative Support Branch (ISB) at OIG headquarters in Washington, D.C., and placed her in a job where she performed primarily administrative duties. Placement of Plaintiff in an administrative capacity meant that she was essentially doing secretarial work rather than investigative work. Plaintiff was not provided any

explanation for the change or a position description, and she was informed that she would be in the new position "until further notice." Some time after the change occurred, Plaintiff's management stopped referring to the move as a reassignment and began to use the term "detail."

24. On February 13, 2019, while Plaintiff was on detail, SAC Sessions told her by email that she was restricted from accessing FDO office space, located in Crystal City, Virginia, and that before she could enter FDO space, she was required to first contact someone in FDO and be "escorted" into the office space. Sessions also directed her to not contact the assigned Assistant U.S. Attorney (AUSA) concerning her former cases. No other Agents on a detail from FDO had been restricted from FDO space or ordered not to contact AUSAs. In addition to demeaning Plaintiff, this requirement signaled that she was no longer welcome as a member of the FDO.

25. On Plaintiff's May 17, 2019, mid-year progress review, SAC Sessions and ASAC Howell included inaccurate statements, failed to highlight her completed work, and failed to mention her noteworthy accomplishments. In this regard, by May 17, 2019, Plaintiff had been on detail with the ISB for several months under SAC Pamela Castleberry's supervision and SAC Castleberry had prepared the initial mid-year review that she shared with Plaintiff, which had rated her as "exceptional." However, HR then instructed Castleberry that she would not be Plaintiff's rating official for the mid-year review, and instead, Castleberry should provide her input about Plaintiff's performance to ASAC Howell. Yet, Howell's mid-year review did not discuss Plaintiff's specific assignments, writing coach Davis's positive assessments, Plaintiff's workload, or her accomplishments during the period, and instead provided a litany of unfounded criticisms, and failed to acknowledge that Howell had "signed off" on several of Plaintiff's work products (he would not have signed off on the work products if had Plaintiff's documents were truly unclear or verbose).

26. After Plaintiff returned from her ISB detail to the FDO in July 29, 2019, Plaintiff learned that while she was on the detail, SAC Sessions had sent a memo to FDO personnel informing them that there was an ongoing EEO investigation and instructing them to contact OIG Attorney Advisor Fallowfield with any questions. By not including Plaintiff on the email, Sessions signaled FDO employees that Plaintiff was the complaining party and intimidated potential witnesses by making it clear that management was concerned about witnesses. In addition, SAC Sessions falsely informed members of the FDO that Plaintiff had performance and character issues and that she had violated safety requirements at the firearms range.

27. In February 2019, while Plaintiff was on the ISB detail, she submitted a request to attend the Association of Certified Fraud Examiners Global Fraud Conference. As a Certified Fraud Examiner, Plaintiff needed the training to stay current in her field. When Plaintiff checked on the status of her request, Castleberry stated that she had forwarded the application to IG management but she didn't "even know if they're allowing you to take training." On June 14, 2019, Plaintiff checked the conference website and saw that the registration for the conference had closed, which meant that she would not be able to attend. The other Fraud Examiners in FDO who requested to attend the training were allowed to do so.

28. When Plaintiff began her ISB detail, SAC Castleberry had no knowledge that FDO officials were assessing Plaintiff's mental fitness to serve as an investigative agent. Between February and April 2019, she reported for "Fitness for Duty" appointments that included a physical assessment in February 2019 and a psychiatric assessment in April 2019. On June 19, 2019, SAC Castleberry told Plaintiff that she been cleared by her Fitness for Duty examination. Plaintiff was shocked when Castleberry relayed this information because HR was not permitted to inform supervisors about an employee's medical assessment and as Plaintiff was limited to

administrative responsibilities, Castleberry had no need to know that Plaintiff's fitness for duty as an investigator was at issue.

29. It was not until July 15, 2019, HR official Harriet Richmond notified Plaintiff of her Fitness for Duty results although the assessments had been completed in April 2019 and the results had been disclosed to management by June 19, 2019. As a result, months went by before Plaintiff was allowed to resume her duties as a Special Agent.

30. While preparing to return to the FDO in early July 2019, Plaintiff submitted a request to attend a July 23-25, 2019 Mid-Atlantic Anti-Money Laundering Conference. SAC Sessions responded by insisting that Plaintiff submit a copy of her Certified Fraud Examiner's license. While Sessions eventually approved her attendance, his insistence on her submitting a copy of her Fraud Examiner license was demeaning and delayed the authorization and constituted further harassment. Plaintiff observed that similarly situated FDO employees had been readily approved to attend the conference without submitting any documentation and the standard practice for requesting training authorization was to send an email to the supervisor asking to "approve or not approve" the training, with no additional justification.

31. On July 18, 2019, while arranging her return to the FDO, Plaintiff submitted a reasonable accommodation request to ASAC Howell asking for permission to telework for three months from home or from a designated off-site location. As part of her accommodation request, Plaintiff also asked that in-person work meetings between her and management be recorded and transcribed for her review, and that meetings with management be preceded by seventy-two hours of notice. Plaintiff she provided medical and other documentation for these requests, and explained that she made the requests because of her continued feelings of anxiety and stress stemming from having to return to the FDO. On July 30, 2019, AIG Lake informed Plaintiff that

her accommodation request had been denied with the exception that Plaintiff would be allowed to telework one day each week.

32. In August 2019, Plaintiff reported for work and began working at the FDO office. However, almost from the start, she began to fall ill periodically because of the continued harassment she experienced, which included not returning her car to her, not assigning her a gun, and initially assigning her only one case, and continuing to micro-manage her work. These actions by FDO supervisors resulted in her feeling ill frequently and having to take leave. Then on August 21, 2019, SAC Sessions emailed that he wanted to meet with Plaintiff and ASAC Howell. Plaintiff was working on a time sensitive matter and was not feeling well, so she asked Sessions if they could meet in a couple of hours. Sessions initially agreed, but came back a short time later saying that they had to meet right away. Plaintiff replied that she would not be able to do so, and Sessions became upset and aggressively responded, "Well, if you're not feeling well, don't you think you need to leave!" Plaintiff therefore took sick leave for the rest of the day and scheduled a doctor's appointment at 3:30 pm on that day.

33. As a result of the encounter on August 21, 2019, Plaintiff went on FMLA leave for the rest of August through October 2019. Although Plaintiff had requested FMLA to take a break from what had been toxic interactions with OIG officials, the harassment she sought to avoid continued when OIG officials sent documentation to her home.

34. Plaintiff remained on FMLA leave, and on November 8, 2019, she resigned from her employment at the OIG as she could no longer tolerate the working condictions because of the harassment and unfairness she experienced while working in FDO.

35. After she left from her job, on December 12, 2019, ASAC Howell and SAC Sessions sent a copy of her 2018-2019 annual appraisal to Plaintiff that did not reflect her actual

performance and downgraded her ratings from her previous year's annual performance. While on FMLA leave, Plaintiff had provided Howell with her self-assessment but Howell provided no feedback to her until November 8, 2019, the day Plaintiff submitted her resignation. As she was on her way out of the door, Howell informed her that she would receive her evaluation in the mail. During the 2018-2019 rating period, Plaintiff spent the majority of her time on detail to the ISB doing administrative work, and while she returned to the FDO in late July 2019, she had been on FMLA leave for the last three months of the rating period. Because she had been on detail for a significant portion of the year, HR had told her that she would be evaluated on how well she did while on detail to ISB. As her ISB manager had prepared a summary assessment of her work that reflected that Plaintiff was a good worker who excelled in her administrative work, there was no basis for downgrading her rating to merely "successful" in three of her rated elements.

36. In addition to seeking telework as a reasonable accommodation, Plaintiff attempted to extricate herself from the work environment in FDO by applying for jobs for which she was well-qualified in other offices. At the time, she had Bachelor of Science Degree in Accounting and a Master of Science Degree in Business Information Technology and seven years experience as a GS-13 Special Agent. Comp. While SAC Sessions had promised to assist her in being transferred to the Washington Field Office (WFO), and it was possible to laterally transfer her to vacant GS-13 positions in WFO, that did not happen. Instead, the negative comments on her 2018 Performance Review had the opposite effect. Plaintiff applied for the positions listed below, including a GS-9 position, but until she left the Agency, she was not able to escape the FDO.

    a.    Washington Field Office, ASAC (GS-14) (2 openings)

    b.    Investigative Support Branch, (GS 14)

    c.    CIO SA (GS-9)

    d.    OIG HQ Operations Br.  ASAC (GS-14)

    e.    WFO SSA (GS-14)

Plaintiff contends that she was well qualified for all of these positions and had qualifications superior to several of the selectees. In this regard, while Plaintiff does not challenge the selection for one of the selectees for the WFO ASAC position, and one of the WFO SSA position, based on her knowledge, skills and abilities, Plaintiff was better qualified than the other selectees for positions identified above, who were white, non-Nigerian, non-disabled males, who had not filed a complaint of discrimination or requested accommodation of a disability . Plaintiff therefore contends that Defendant continued to discriminate against her because of her race, national origin as well as her requests to accommodate her disability and retaliated against her for complaining of discrimination by refusing to select her for one of these positions or to laterally reassign her to a position outside the FDO.

**STATEMENT OF CLAIMS**

**Count I.  Discrimination Based upon Race, National Origin and Disability.**

37. By allowing a subordinate to single Plaintiff out for abuse, and then launching a course of action against her designed to both demoralize her and set her up for failure and eventually result in her termination, Defendant discriminated against Plaintiff based on her sex, race, nationality and/or disability by subjecting her to a hostile work environment.

38. As a result of this unlawful discrimination, Plaintiff has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such

employment, career damage, personal and professional embarrassment and humiliation, both delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

### Count II. Discrimination Based on Disability.

39. By refusing to accord Plaintiff reasonable accommodations despite her well documented disabilities, Defendant discriminated against Plaintiff based on her disabilities in violation of the Rehabilitation Act of 1973.

40. As a result of this unlawful discrimination, Plaintiff has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such employment, career damage, personal and professional embarrassment and humiliation, both delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

### Count III. Discrimination Based upon Race, National Origin, Disability and Prior Protected EEO Activity.

41. By refusing to select Plaintiff and selecting lesser qualified applicants for the positions identified in paragraph 35, Defendant discriminated against Plaintiff based on her sex, race, nationality, disability and prior protected activity.

42. As a result of this unlawful discrimination, Plaintiff has suffered and continues to suffer adverse consequences, including loss of pay and benefits of such employment, career damage, personal and professional embarrassment and humiliation, both delayed healing and an exacerbation of her medical condition, physical and emotional pain and suffering, and a loss of the enjoyment of life.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests this Court enter judgment in her favor and against Defendant on her claims of unlawful discrimination and retaliation, and provide her with the following relief:

(a) award Plaintiff compensatory damages against Defendant in the amount of $300,000.00, plus interest thereon;

(b) order Defendant to retroactively place Plaintiff in a Grade 14 ASAC position in the Washington Field Office with full back pay and other benefits (less appropriate offsets), with interest thereon;

(c) enjoin Defendant from further discriminating or retaliating against Plaintiff;

(d) award Plaintiff the costs of bringing and maintaining this civil action and the administrative charges that preceded it, including reasonable attorneys' fees; and

(e) award Plaintiff such other and further relief as the interests of justice may require.

**JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues of fact, including the measure of damages.

Respectfully submitted,

*/s/ Richard L. Swick*
Richard L. Swick
D.C. Bar No. 936930
rlswick@swickandshapiro.com

David H. Shapiro
D.C. Bar No. 961326
dhshapiro@swickandshapiro.com
SWICK & SHAPIRO, P.C.
1432 K Street, N.W., 12th Floor
Washington, DC 20005
Tel (202) 842-0300
Fax (202) 842-1418

Attorneys for Plaintiff