UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **EVELYN KAYODE**, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-03802 (TNM) |
| **MERRICK B. GARLAND**, | |
| Defendant. | |

### MEMORANDUM ORDER

Evelyn Kayode alleges that Department of Justice personnel discriminated against her because of her race, national origin, and disability; failed to reasonably accommodate her disability; and retaliated against her for seeking accommodations. The Attorney General now moves for dismissal, or, in the alternative, summary judgment. The Court concludes that Kayode's allegations against her supervisors—that they harassed her and denied her telework requests—can sustain her hostile work environment, failure to accommodate, and retaliation claims at least for now. But Kayode fails to allege sufficient facts to plead her hostile work environment claim based on her coworker's conduct and her non-selection claim. The Court thus grants in part and denies in part the Attorney General's motion.

**I.**

From 2015 to 2019, Kayode worked as a GS-13 Special Agent in the Fraud Detection Office (FDO) of the Department's Office of the Inspector General (OIG). Am. Compl. ¶¶ 8, 34, ECF No. 16. In this role, Kayode investigated contract, healthcare, and grant fraud. *Id.* ¶ 8. Her initial record at the FDO was positive, reflecting no performance or wellbeing issues. Indeed, her 2015–2016 performance review reported that she had "quickly endeared her[self] to her

fellow agents and managers" with her "strong interpersonal skills."  Pl.'s Opp'n to Def.'s Mot. to Dismiss (Opp'n) at 6, ECF No. 23.  But Kayode alleges that trouble began in 2016, when some of her colleagues started treating her in a "rude," "offensive," and "unprofessional" manner—all because she is a "black female" whose "national origin is Nigerian."  Am. Compl. ¶¶ 7, 12, 19.  Stress from this negative treatment allegedly compounded Kayode's anxiety, irritable bowel syndrome, and hypertension.  Id. ¶¶ 15, 42.  In 2018, Kayode started requesting accommodations for these disabilities, including permission to telework.  Id. ¶¶ 15, 19, 31.  Some of these requests were granted outright, some conditionally, and some denied.  Id.  Kayode now argues that the Department failed to accommodate her known disabilities, and that her supervisors further retaliated against her after she made these requests.  Id. ¶ 1.

The first set of workplace discrimination allegations involve Investigative Specialist Denise Korpinen, Kayode's coworker and subordinate, whose responsibilities included assisting OIG agents in their investigations.  Id. ¶¶ 10–11.  Kayode alleges that Korpinen engaged in the following discriminatory conduct:

- Korpinen delayed processing a transcript Kayode had requested by pushing the deadline back 10 days.  Id. ¶ 11.

- During an office reshuffle, Korpinen emailed Kayode a question about her personal items but then arranged for those items to be moved before Kayode could respond.  Id.

- In a meeting with supervisors to address their simmering interpersonal conflict, Korpinen yelled at Kayode and called her a "bad person."  Id.

- And finally, Korpinen barged into a meeting between Kayode and her supervisor, Drew Hartwell, and argued with Kayode in a "belligerent, unprofessional manner."  Id. Korpinen encroached on Kayode's physical space, but Hartwell intervened only after Kayode told Korpinen to "get out of my face."  Id.

Kayode alleges that Korpinen's conduct created a hostile work environment (Count I).

Id. ¶¶ 37–38.  Because Korpinen, a white female, did not engage with white or non-Nigerian

people in a similar manner, Kayode contends that her hostility was based on Kayode's race and national origin. *Id*.

The next set of allegations involve Kayode's relationship with her direct supervisor, Assistant Special Agent in Charge Amber Howell, and her second-line supervisor, Special Agent in Charge Lewe Sessions. *Id*. ¶ 10. Taken together, these allegations undergird Kayode's remaining claims: hostile work environment (Count II), retaliation (Count III), failure to accommodate (Count IV), and non-selection (Count V).

The bulk of Kayode's allegations relate to her supervisors' responses to her telework requests. First, in November 2018, Kayode submitted an accommodation request to Howell seeking permission to telework for a six-week period starting the next month. *Id*. ¶ 15. As grounds for the accommodation, Kayode explained that the hostile work environment had resulted in increased anxiety, decreased sleep, higher blood pressure, and an aggravation of her IBS [irritable bowel syndrome]." *Id*. The request was eventually granted on November 30, though Kayode argues that other employees who requested telework were "routinely provided immediate accommodation." *Id*. Kayode asserts that her telework accommodation was "demeaning and restrictive" because her supervisors demanded that she work on specific matters, complete work within a set time frame, and email them at the start and end of her workday. *Id*. Even more, her supervisors imposed no such requirements on FDO employees who were white or non-Nigerian and who had not requested accommodation for a disability. *Id*.

Kayode alleges that, after this initial accommodation request, her supervisors responded with the following adverse actions:

- Howell assigned Kayode a "writing coach" even though Kayode had never been told her writing was deficient. *Id*. ¶ 16.

3

- When Kayode met with Howell to address an issue involving the writing coach, Howell "began screaming" at her. *Id*. Then Kayode received a Memorandum of Caution regarding the meeting which "falsely portray[ed] [Kayode] as the aggressor" and accused her of being "combative and disruptive." *Id*. ¶ 17.

- Howell emailed Kayode "falsely accusing her of not having made progress on her work assignments." *Id*. ¶ 18. Kayode rebutted this allegation, asserting that she had "worked overtime, including at night and on the weekends, to be sure that she did not fall behind on her work." *Id*.

In January 2019, Kayode made a second accommodation request, seeking another eight weeks of telework. *Id*. ¶ 19. The human resources department immediately granted her two weeks' telework and informed her it would decide the remaining six later. *Id*. Following this request, Kayode alleges her supervisors took these actions:

- Kayode was ordered to submit to a psychiatric evaluation—the only agent in her unit who was required to do so. *Id*. ¶ 21.

- From January to July 2019, Kayode was detailed from the FDO to the Investigative Support Branch (ISB) at OIG headquarters. *Id*. ¶ 23, 26. Her duties there were largely "secretarial" rather than investigative. *Id*. ¶ 23.

- In February 2019, Kayode's supervisors ignored her request to attend a professional conference, which other FDO agents attended. *Id*. ¶ 27.

- Similarly, in July 2019, Kayode requested permission to attend an anti-money laundering conference. *Id*. ¶ 30. Sessions approved the request but insisted that Kayode submit a copy of her Fraud Examiner license. *Id*. Kayode contends the request was not standard practice. *Id*.

- In Kayode's mid-year progress review, Sessions and Howell "included inaccurate statements, failed to highlight her completed work, and failed to mention her noteworthy accomplishments." *Id*. ¶ 25.

Kayode made her final accommodation request in July 2019, just as she was set to return to the FDO from her ISB detail. *Id*. ¶ 31. Once again, Kayode sought permission to telework—this time for three months. *Id*. She also requested that she be given 72-hours' notice before any meeting with management and that in-person meetings with management be recorded. *Id*. Kayode's supervisors denied this request but gave her the option to telework once a week. *Id*.

Kayode briefly returned to the FDO in August 2019. But she allegedly experienced "continued harassment," as her supervisors did not "assign[] her a gun" and "continu[ed] to micromanage her work." *Id*. ¶ 32. So she took FMLA leave. *Id*. And she remained on leave until her resignation in November 2019. *Id*. ¶¶ 33–34.

Along with requesting telework, Kayode sought to accommodate her disability by securing a comparable job in another unit. Kayode asserts that she was not selected for three positions despite being better qualified than those ultimately hired, who were white, non-Nigerian, non-disabled males who had not filed EEO complaints or requested accommodations. *Id*. ¶ 36. She attributes her inability to get hired in part on her negative performance review for 2018–2019, which she alleges did not incorporate positive feedback she had received from her supervisor while on ISB detail. *Id*. ¶¶ 35–36.

In March 2019, while she was still on temporary assignment with the ISB, Kayode filed a complaint with the Equal Employment Opportunity (EEO). She alleged discrimination based on sex, race, nationality, disability, and protected EEO activity. Am. Compl. ¶ 6. In September 2022, the Department issued a final agency decision on Kayode's EEO complaint, advising her of her right to file a civil action. *Id*.

Kayode brought this suit in December 2022. The following March, the Attorney General filed a partial motion to dismiss for failure to state a claim. Def.'s Partial Mot. to Dismiss, ECF No. 10. Then, in June, the Court denied the Attorney General's motion as moot and ordered Kayode to file an amended complaint, noting that the claims presented in her initial complaint "border[ed] on incomprehensible." Order at 1, ECF No. 15. The Court admonished Kayode that the "Amended Complaint *must clearly state Plaintiff's claims*." *Id*. at 2. And to do so, "she

5

must specify one statute, one legal theory, and a clear set of facts that applies to each count," with every claim "correspond[ing] to a count." *Id*.

Kayode filed her Amended Complaint later that month. While the new complaint complies with some of the Court's requirements, it ignores others. For one, the Amended Complaint does not break out the hostile work environment claim into separate counts for race, national origin, and disability, as the Court instructed. *See* Am. Compl. ¶¶ 37–40. The Attorney General argues Kayode's noncompliance alone warrants dismissal. Def.'s Mot. to Dismiss (MTD) at 10, ECF No. 18. But the Court will address each of Kayode's claims on the merits, even though Kayode's Amended Complaint barely improves on the original.

## II.

A defendant may move to dismiss a complaint on grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive such a motion, the complaint must allege facts that, taken as true, state a plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"In determining whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). This is "a context-specific task that requires

the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### III.

Kayode's claims break down as follows: (A) two hostile work environment claims, (B) a failure to accommodate claim, (C) a retaliation claim, and (D) a non-selection claim. The Court grants the Attorney General's motion to dismiss as to Kayode's first hostile work environment claim (Count I) and the non-selection claim (Count V). It denies the motion to dismiss as to the second hostile work environment claim (Count II), the accommodation claim (Count IV), and the retaliation claim (Count III).

### A.

Consider first Kayode's Title VII hostile workplace claims. To prevail, Kayode must show that her employer subjected her to "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). These are difficult claims to successfully advance. *Arnoldi v. Bd. of Trustees, Nat'l Gallery of Art,* 557 F. Supp. 3d 105, 120 (D.D.C. 2021), *aff'd,* 2022 WL 625721 (D.C Cir. Mar. 1, 2022).

When assessing workplace hostility, courts look to "the totality of the circumstances." *Baloch,* 550 F. 3d at 1201. This includes "the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id*.

As pled, the conduct of Kayode's coworker, Korpinen, does not meet "the demanding standards for a hostile work environment claim." *Sewell v. Chao*, 532 F. Supp. 2d 126, 141–42 (D.D.C. 2008). Recall that Kayode alleges her coworker (1) changed the deadline on an

assignment, (2) arranged for her personal property to be moved without giving her enough time to object, and (3) at one point orally accosted her and "got into her physical space." Am. Compl. ¶ 11.  The first two allegations are far from severe enough to constitute harassment or intimidation.  As courts have routinely recognized, "rude emails, lost tempers[,] and workplace disagreements" do not create a hostile work environment.  *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015).  Rather, such instances are among the "ordinary tribulations of the workplace . . . that are not actionable under Title VII."  *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014) (cleaned up).

The third allegation—that Korpinen orally accosted her and encroached on her personal space—is more severe.  Still, isolated expressions of frustration, "unless extremely serious," do not "amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Baloch*, 550 F.3d at 1201 (concluding that even "several verbal clashes with [a] supervisor" did not support a hostile work environment claim); *Brooks*, 748 F.3d at 1277 (concluding that "outbursts by a coworker and [a] supervisor" did not create hostile work environment).  And here, Kayode's supervisor ultimately intervened to prevent the conflict with Korpinen from escalating, undermining any suggestion of a truly abusive environment.  The Court therefore grants the Attorney General's motion to dismiss as to Count I.

Kayode's second hostile work environment is plausible—but barely.  Kayode alleges that her supervisor, Howell, accused her of not doing her work, requested her access logs to the office, downgraded her performance ratings, delayed acting on accommodation requests, referred her to a "writing coach," yelled at her at least once, threatened her with disciplinary action, sent her harassing emails, and assigned her to detail at the ISB doing "secretarial work." Am. Compl.

¶ 39.  Kayode's second-line supervisor, Sessions, also allegedly ignored Kayode's complaints about the "harassing nature" of Howell's conduct and wrongfully denied her access to the FDO SharePoint and email list.  *Id*. ¶¶ 13, 39.  Many of these allegations involve mere "personality conflicts" that are not actionable under Title VII.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Nor do these allegations clearly show the kinds of "tangible workplace consequences, whether financial, physical, or professional" necessary to support a hostile work environment claim.  *Baloch*, 550 F.3d at 1201.  Still, at this early stage, the Court finds that Kayode's allegations "provide enough factual heft to show a plausible entitlement to relief."  *Winston v. Clough*, 712 F. Supp. 2d 1, 13 (D.D.C. 2010).  So the Court denies the Attorney General's motion to dismiss on Count II.

## B.

Next up is Kayode's failure to accommodate claim (Count IV).  To state a claim for a violation of the Rehabilitation Act's reasonable accommodation requirement, Kayode must allege that "(i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability."  *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (cleaned up).

Kayode states a failure to accommodate claim.  To start, the Attorney General does not dispute that Kayode had a known disability—anxiety, IBS, and hypertension.  MTD at 28–29.  And he also concedes that at least one of Kayode's telework requests was denied in part.  *See* Def.'s Reply to Pl.'s Opp'n (Reply) at 6, ECF No. 28.  The Attorney General contends, however, that this request was denied for good cause on the grounds that it was incompatible with

Kayode's duties as a Special Agent and would impose unreasonable burdens. *Id*. Perhaps, but the dismissal stage is not well suited to such an evaluation. For now, the Court concludes that Kayode has plausibly alleged that the telework accommodation would still allow her to perform the essential functions of her job, especially since she had previously been granted similar accommodations. *See* Am. Compl. ¶ 15, 19. So the Court denies the Attorney General's motion to dismiss as to Count IV.

### C.

Next, consider Kayode's retaliation claim (Count III).[1] To establish a prima facie case of retaliation under the Rehabilitation Act, Kayode must show that she (i) "engaged in statutorily protected activity"; (ii) "suffered a materially adverse action by the employer"; and (iii) "there is a but-for causal link between the two." *Congress v. Gruenberg*, 643 F. Supp. 3d 203, 229 (D.D.C. 2022). The Attorney General concedes that Kayode's requests for accommodations are "protected activities." *See* MTD at 23 (citing *DuBerry v. District of Columbia*, 582 F. Supp. 2d 27, 37 (D.D.C. 2008)). But he argues that Kayode has failed to allege she suffered any materially adverse actions by her employer.

In the retaliation context, an action is adverse if it "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crowley v. Vilsack*, 236 F. Supp. 3d 326, 330 (D.D.C. 2017) (quoting *Burlington*, 548 U.S. at 60). This standard encompasses a "broader sweep of actions" than the standard for a discrimination claim, which

---

[1] Kayode's Amended Complaint fashions Count III as a "Coercion and Retaliation" claim. Am. Comp. ¶ 41. But the Amended Complaint does not explain how Kayode was coerced after seeking reasonable accommodations. *Id*. Nor does Kayode's Opposition address the Attorney General's argument that any coercion claims should be dismissed for failure to state a claim. The Court thus treats these arguments as conceded. *See Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

requires the plaintiff to establish that the employer's action "affect[ed] the terms and conditions of employment." *Congress*, 643 F. Supp. 3d at 230 (cleaned up).  For her part, Kayode incorporates the litany of harassing conduct from her hostile work environment claims.  Am. Compl. ¶ 42.  But many incidents Kayode describes in her complaint involved "letters of counseling and performance reviews[,] [which] typically do not constitute materially adverse actions absent some further tangible job consequences." *Bain v. Off. of Att'y Gen.*, 648 F. Supp. 3d 19, 57 (D.D.C. 2022) (cleaned up).  And other incidents, such as Kayode's removal from the SharePoint site or her supervisor ignoring a request to attend a conference, are the kind of "petty slights or minor annoyances that often take place at work and that all employees experience." *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 132 (D.D.C. 2016) (quoting *Burlington*, 548 U.S. at 68).

Still, some of the alleged adverse actions plausibly altered the conditions of Kayode's employment.  Consider Kayode's temporary assignment to the ISB, where she performed "secretarial" rather than investigative work.  *See id*. ¶¶ 23, 39(q).  Because "reassignment with significantly different responsibilities" can constitute an adverse employment action for retaliation purposes, *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (cleaned up), Kayode adequately pleads the second element of her retaliation claim.  *See also Harbour v. Univ. Club of Washington*, 610 F. Supp. 3d 123, 136 (D.D.C. 2022) (finding that plaintiff who was "functionally reassigned to a position with different, lesser responsibilities" sufficiently pled retaliation claim).[2]  At summary judgment, however, Kayode must show that any reduction in

---

[2]  The Attorney General contends Kayode conceded flaws in her retaliation claim by failing to respond to his arguments in her Opposition.  *See* Reply at 5.  The Court agrees that most of the Attorney General's arguments go unanswered but finds that Kayode does not forfeit the claim entirely, at least regarding Kayode's temporary transfer to the ISB.

responsibility resulted in "objectively tangible harm." *See Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (cleaned up).

Last, Kayode satisfies the low bar for pleading a "but-for" causal relationship between her protected activity and the adverse action. At the motion-to-dismiss stage, Kayode "can meet her *prima facie* burden of causation simply by alleging that the adverse actions were caused by her protected activity." *Vance v. Chao*, 496 F. Supp. 2d 182, 187 (D.D.C. 2007). That she has done. *See* Am. Compl. ¶ 42. Whether this claim survives the more demanding summary judgment standard remains to be seen.

### D.

Finally, consider Kayode's non-selection claim (Count V). In the Amended Complaint, Kayode alleges that the Department discriminated against her based on her race, sex, nationality, disability, and prior protected activity by not selecting her for five positions at the Department's Washington Field Office (WFO). Am. Compl. ¶¶ 36, 48–49. But Kayode tries to shift gears in her Opposition: she abandons her argument that she was not selected for these five positions and instead contends that the Department failed to transfer her to a lateral GS-13 position in the WFO. Opp'n at 29. The Court will not address allegations that Kayode failed to include in her Amended Complaint. *See Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 87 n.4 (D.D.C. 2010) ("[P]laintiff may not amend her complaint by the briefs in opposition to a motion to dismiss."). Since Kayode failed to address the Attorney General's argument that the Amended Complaint lacks any factual allegations supporting the non-selection claim, the Court grants the motion to dismiss as to those claims.

**IV.**

For these reasons, it is hereby **ORDERED** that the Attorney General's Motion to Dismiss is **GRANTED** as to Count I and Count V of Kayode's Amended Complaint. The Motion to Dismiss is otherwise **DENIED**.

**SO ORDERED**.

Dated: November 21, 2023

TREVOR N. McFADDEN
United States District Judge